**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

NETCHOICE,

*Plaintiff*,

v.

TODD ROKITA, in his official capacity as Attorney General of the State of Indiana,

*Defendant*.

Case No. 1:26-cv-2500

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Indiana House Enrolled Act 1408 is the latest in a long line of government efforts to restrict constitutionally protected expression based on concerns about its potential effects on minors. Books, movies, television, rock music, video games, and the Internet have all been in the crosshairs; now, similar debates rage about "social media." These debates are important, but the First Amendment does not countenance government efforts to resolve them. And it certainly does not tolerate government efforts to suppress constitutionally protected speech because the government thinks minors spend too much time engaging with it.

2. Nevertheless, some states have recently taken it upon themselves to try to restrict minors' access to constitutionally protected speech on some of the most popular online services. Several courts have rejected those efforts as inconsistent with the First Amendment. *See, e.g.*, *NetChoice v. Hilgers*, 840 F.Supp.3d. 777, 790-97 (D. Neb. 2026), *appeal pending*, No. 26-2478 (8th Cir.); *NetChoice v. Jones*, 822 F.Supp.3d 656, 675-76 (E.D. Va. 2026), *appeal pending*, No. 26-1252 (4th Cir.); *NetChoice, LLC v. Reyes*, 748 F.Supp.3d 1105, 1120-23, 1134 (D. Utah 2024), *appeal pending*, No. 24-4100 (10th Cir.); *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *7-10, 17 (W.D. Ark. Mar. 31, 2025), *appeal pending*, No. 25-1889 (8th Cir.). *But see CCIA v. Uthmeier*, __F.4th__, 2026 WL 3071065, at *12 (11th Cir. Oct. 14, 2026); *NetChoice, LLC v. Yost*, 180 F.4th 268, 288-93 (6th Cir. 2026). And rightly so. Restricting the ability of minors (and adults) to access social media services via continuing age verification and parental consent requirements is not a narrowly tailored means of advancing any legitimate state interest. While the state perhaps "has the power to *enforce* parental prohibitions—to require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend," "it does not follow that the state has the power to prevent children from

hearing or saying anything *without their parents' prior consent*." *Brown v. Entmt. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011). Such laws "are obviously an infringement" on the First Amendment rights of "young people and those who wish to proselytize young people." *Id.* They "do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Id.*

3. Like the laws that preceded them, the challenged provisions of HEA 1408 violate the First Amendment both on their face and as applied to NetChoice's members in two distinct ways. First, HEA 1408 requires "social media provider[s]" to "use commercially reasonable means, such as a neutral age screen mechanism, to determine the age and state of residence of the individual requesting creation of the account." Ind. Code §24-16-3-1(1). And if the individual is under 16, then the social media provider "may create the account only if [it] receives verifiable parental consent to creation of the account." *Id.* §24-16-3-1(2). By restricting the ability of minors (and adults, who must now prove their age) to access these services, Indiana has "with one broad stroke" restricted access to valuable sources for speaking and listening, learning about current events, "and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). And, even worse than other (unconstitutional) predecessors, the Act imposes a *continuing* obligation to verify users' age, triggered by the amount of time they spend engaging with protected speech, as well as each time the social media provider collects demographic information of any kind regarding the Indiana account holder.

4. Second, not satisfied with restricting access to this wide swath of First Amendment-protected speech, Indiana also seeks to force NetChoice members to surrender editorial control over the recommendation systems and expressive features that shape how they curate and present speech to minors. The Act thus prohibits covered social media providers from displaying or

recommending personalized content and advertising—that is, the user-specific "feed" at the core of social media services' expressive offering. *Id.* §24-16-3-2(c)(3). The Act further prohibits covered providers from making so-called "addictive features" available to adolescent[1] accounts, thereby placing off limits common mediums and modes of presentation through which users encounter and interact with speech—including infinite scroll, autoplay, engagement metrics, and livestreaming—even with parental consent. Ind. Code §24-16-3-2(c)(4). Indiana's fixation on the curation and expressive features that make social media services attractive and engaging to users lays bare the fatal defect with the state's approach. Bookstores sort and display their offerings to appeal to their audience, libraries arrange their shelves to make books accessible to patrons, and curators like Oprah's Book Club seek to recommend content tailored to their audiences' interests. Indeed, expressive works have always used devices to capture and sustain audience attention. Television episodes end with cliffhangers to encourage viewers to watch the next episode. Books employ short chapters so readers will turn the page. Movies tease future plot points in post-credit scenes to entice audiences to stay seated during the credits and return for a sequel. Streaming services automatically play the next episode or the next song to keep users engaged. It is unthinkable that Indiana could force Barnes & Noble to relegate bestsellers to the back of the store, transform Oprah's Book Club into a chronological list of published works, ban producers from using cliffhangers, force authors to write longer chapters, forbid studios from using post-credit scenes, or stop streaming services from automatically playing the next episode because (in the state's view) those choices and features make protected speech too engaging. And it is just as

[1] HEA 1408 defines an "adolescent" as "an individual who is less than sixteen (16) years of age." Ind. Code. §24-16-2-2.

unthinkable that Indiana could forbid covered providers to recommend speech tailored to their audiences or to use expressive features designed to facilitate engagement with that speech.

5. As the Supreme Court recently made clear, the First Amendment "does not go on leave when social media are involved"; it protects an online service's decision to "presen[t] a curated compilation of speech originally created by others," including its decisions about how to select, prioritize, organize, and display that speech. *Moody v. NetChoice*, 603 U.S. 707, 719, 728 (2024). The Act violates those constitutional rights many times over. What is more, in restricting adolescents' access to personalized content curation and expressive features like autoplay, the Act violates their rights as well. "Children have First Amendment rights," *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 576 (7th Cir. 2001), and we "expect [them] to exercise those liberties [] to learn to think for themselves, to give voice to their opinions, [and] to hear and evaluate competing points of view." *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1055 (7th Cir. 2004).

6. Indiana's real concern appears to be that some minors spend too much time on social media. Indeed, the statute expressly singles out services *because* they are very popular—i.e., 10% of a provider's "[d]aily active users" engage with the service for more than two hours per day. Ind. Code §§24-16-2-3(1), 2-5(a)(1)-(2). But the Supreme Court has repeatedly admonished that the government may not restrict speech just because a lot of people want to hear or read it. Otherwise, the government could restrict access to the most popular segments of nearly any medium for constitutionally protected speech. By Indiana's logic, it could restrict all minors from accessing libraries just because some spend (in the state's view) too much time reading page-turning novels, or from using streaming services because some spend too much time watching engaging cartoons. Or it could restrict the use of cliffhangers, shorter chapters, serialization, or

any of the many other expressive devices developed over millennia to keep audiences engaged with speech.

7. The Court should declare the challenged provisions of HEA 1408 (specifically, Indiana Code §§24-16-3-1, 24-16-3-2(a)-(b) and (c)(2), 24-16-4-1, and 24-16-4-2) unconstitutional on their face and/or as applied to NetChoice's members and enjoin the Attorney General of Indiana from enforcing them.

**THE PARTIES**

8. Plaintiff NetChoice is a nonprofit trade association whose members operate many online services, including (among others) Instagram, TikTok, and YouTube. A full list of NetChoice's members is located here: https://perma.cc/EWT7-MDGN. NetChoice's mission is to promote online commerce and speech and to increase consumer access and options through the Internet, while minimizing burdens on businesses that make the Internet more accessible and useful. NetChoice serves the interests of its members, who share a commitment to the vital First Amendment protections that HEA 1408 undermines. NetChoice brings this action on behalf of its members to vindicate their First Amendment rights and the First Amendment rights of their users, and to prevent the economic and other injuries that HEA 1408 will cause members absent relief.

9. Defendant Todd Rokita is the Attorney General of Indiana. Indiana Code §24-16-6-1 charges the Indiana Attorney General with enforcement of the provisions amended by HEA 1408. Attorney General Rokita is a resident of Indiana. NetChoice sues Attorney General Rokita for declaratory and injunctive relief in his official capacity as the Attorney General of Indiana.

**JURISDICTION AND VENUE**

10. NetChoice's causes of action arise under 42 U.S.C. §1983 and the United States Constitution. This Court therefore has subject matter jurisdiction under 28 U.S.C. §1331. This

Court has authority to grant legal and equitable relief under 42 U.S.C. §1983 and *Ex parte Young*, 209 U.S. 123 (1908), injunctive relief under 28 U.S.C. §1651, and declaratory relief under 28 U.S.C. §§2201(a) and 2202.

11. NetChoice has standing to challenge HEA 1408 because: (1) some of its members have Article III standing to sue in their own right; (2) challenging the Act is germane to NetChoice's associational purposes; and (3) its members' individual participation as parties is unnecessary in this challenge. *See Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977).

12. Venue is proper in the Southern District of Indiana under 28 U.S.C. §1391 because the defendant performs his official duties there and is therefore considered to reside in this district as a matter of law.

## **BACKGROUND**

13. NetChoice is an Internet trade association whose members operate many online services, including Instagram, TikTok, and YouTube. These services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham*, 582 U.S. at 107. On Instagram, individuals can sign up for an account and establish mutual connections with family and friends, share about their lives through various types of content (such as stories, photos, videos, captions, status updates, and links, among others), and follow the public profiles of businesses, organizations, government entities, and public figures. On TikTok, users can find advice, support, and empathy. And YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions.

14. Like adults, minors use these services to engage in an array of First Amendment activity on a wide range of topics. Minors use online services to read the news, connect with

friends, explore new interests, follow their favorite sports teams, and research their dream colleges. Some use online services to hone a new skill or showcase their creative talents, including photography, writing, or other forms of expression. Others use them to raise their profiles in the world of collegiate athletics—especially those who cannot afford to travel or who do not live near hubs for athletic recruiting. Still others use them to raise awareness about social causes and to participate in public discussions on salient topics of the day. And others use them to build communities and connect with others who share similar interests or experiences, which is particularly helpful for minors who feel isolated or marginalized at home, or are seeking support from others who understand their experiences.

15. The operators of these services also engage in their own First Amendment activity. In curating and disseminating third-party speech to their users, they author a "distinctive expressive offering." *Moody*, 603 U.S. at 738. Meta, which operates Instagram, curates and disseminates third-party content to its users based on its judgment about what content is appropriate for its users and the type of service it wants to cultivate, as well as based on what content it thinks users are likely to enjoy. YouTube likewise disseminates videos to users based on YouTube's judgment about what is appropriate for its service and its users and what users may find especially interesting. TikTok also disseminates speech to its users based on its own judgment about what content is appropriate on their services, as well as users' preferences.

16. These services make myriad decisions in moderating content to provide the "distinctive expressive offering" that reflects the speech community they wish to foster, and in determining and presenting the content users are likely to enjoy:

a. Instagram uses Meta's ranking and recommendation systems to curate content for individual users to help users find content, in accordance with Meta's

Community Standards. Meta employs a multi-stage process to retrieve and rank the content that is displayed to users, making it easier for users to find information that may be relevant and valuable to them. At various points, Meta excludes content, including content flagged by humans and by automated review for violating Meta's Community Standards. The retrieval stage identifies several thousand content candidates to be ranked in the next stage. Meta then uses "signals" to make predictions about which content users may find relevant and valuable. These signals include data about the user, data specific to the post being ranked (such as who created the post, how others have interacted with it, whether the content of the post likely violates Meta's content policies, and the percentage of identical content between the post and other posts), as well as data specific to the user and the post, such as how the user has previously interacted with similar posts or the post's author. Meta uses these signals to make personalized predictions about which content the user may find relevant and valuable. Meta's prediction models include the likelihood that the user will meaningfully interact with a post, the likelihood that the user's interactions with a post will encourage others to share more content in the future that is valuable to the user, how likely the user is to find the post worth their time, and how likely the user is to click on the profile of a post's author.

b. For TikTok, content recommended in the For You feed is the result of purposeful choices humans make about what content to show people on the TikTok platform. Those choices include the policies they draft and enforce through the platform's Community Guidelines, the rules they select for the platform's recommendation system, and the editorial priorities they set for monitoring content on the platform. The content recommended in an individual's For You feed is based on, among other factors, TikTok's assessment of what content aligns with its Community Guidelines and editorial priorities, the individual's interests, and the individual's engagement with the feed. For example, TikTok's Community Guidelines emphasize "encourag[ing] kindness and respect," "champion[ing] inclusion," requiring that discussions about social and political issues be

respectful, and prohibiting bullying and harassment. While individuals' preferences are an important part of the recommendation process, they are not the sole factor TikTok uses to determine what content appears in any individual's For You feeds.

c. YouTube presents a customized and curated list of video recommendations to each user via its "Recommender System," a complex system created, trained, and monitored by humans to recommend videos. YouTube engineers build and train the Recommender System to accomplish its objectives, including by selecting inputs and deciding how to translate those inputs into recommendations. Some inputs relate to individual users, like the user's age, language, watch and search history, while others relate to users' responses and preferences like channel subscriptions, likes, dislikes, feedback, and surveys. YouTube's decision to analyze these particular factors and assign certain weights to them reflects its own expressive judgment regarding which of these factors it wants to prioritize and which it believes are likely to be valued by its users. In addition to prioritizing recommendations that viewers want to see, YouTube also focuses on providing responsible recommendations that connect viewers to high-quality information and minimize the chances they will see problematic content. To accomplish this, YouTube engineers ensure the recommendation system also takes into account, for example, the extent to which content might be considered borderline or clickbait in determining whether it will be widely recommended across the platform. For children and teens in particular, YouTube's personalized recommendations are imbued with YouTube's judgments and consultation with experts about the types of content appropriate for minors in different age categories (for example, under-12 users versus older teens). YouTube further adjusts its recommendations to advance its priorities as a platform, like promoting novelty and discovery. YouTube employees have designed the Recommender System to ensure that its recommendations include novel and diverse content which requires YouTube employees to make substantive judgments like whether physics and math are sufficiently different so that they should count as diverse or be grouped together as STEM topics. Additionally,

YouTube designed its Search function so that a user who enters a search query receives results that, in addition to being generally high-quality, are personally relevant to that user.

17. Just as people inevitably have different opinions about what books, television shows, and video games are appropriate for minors, people inevitably have different views about whether and to what degree online services like Instagram, TikTok, and YouTube are appropriate for minors. Concerns that new means of communication may be harmful to minors are hardly new. The same basic concerns animating discussion about minors' access to the Internet have been raised repeatedly in the past about other types of speech and other mediums of expression.

18. In the 1800s, for example, "penny dreadful" publications were condemned for glorifying criminals and were blamed for juvenile delinquency by the media and parents alike. *See* James B. Twitchell, *Preposterous Violence: Fables of Aggression in Modern Culture* 168-69 (1989). Decades later, comic books were derided as "particularly injurious to the ethical development of children." *Juvenile Delinquency (Comic Books), Hearings Before the Subcomm. to Investigate Juv. Delinq.*, 83rd Cong., 2d Sess. 86 (1954) (testimony of Dr. Frederic Wertham). Movies were accused of "possess[ing] a great[] capacity for evil, particularly among the youth of a community." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952). Television too. *See, e.g.*, Surgeon Gen.'s Sci. Advisory Comm. on Television & Soc. Behav., U.S. Pub. Health Serv., *Television and Growing Up: The Impact of Televised Violence, Report to the Surgeon General* (1971), https://perma.cc/T73X-NYR2; *Juvenile Delinquency (Television Programs): Hearings Before the Subcomm. to Investigate Juv. Delinq.*, 83d Cong., 2d Sess. (1954). In the 1980s, "partly clad, long-haired rockers who sing about sex, sado-masochism, suicide, murder and other things" were the problem. *See* Irvin Molotsky, *Hearing on Rock Lyrics*, N.Y. Times (Sept. 20, 1985), https://tinyurl.com/yrknwwf8. A decade later, families and lawmakers alike raised concerns about

the harmful effects of the Internet. *See* H.R. Rep. No. 105-775, at 6-7 (1998). Concerns about violent video games followed soon after. *See Brown*, 564 U.S. at 789-90.

19. As these historical examples reflect, people inevitably have different opinions about what content and mediums are appropriate for minors. Some believe that Mark Twain's *Adventures of Huckleberry Finn* is inappropriate because it contains racial epithets; others think it is a uniquely valuable piece of literature. *See* Alvin Powell, *Fight Over Huck Finn Continues: Ed School Professor Wages Battle for Twain Classic*, Harvard Gazette (Sept. 28, 2000), https://perma.cc/5SU5-EP6M. Some think *Saving Private Ryan* is too violent for minors; others think it imparts valuable lessons. *See Graphic 'Private Ryan' Not For Kids*, Chi. Tribune (Aug. 6, 1998), https://perma.cc/8V74-29PA. Some think video games are unduly violent. *See* William Siu, *I Make Video Games. I Won't Let My Daughters Play Them*, N.Y. Times (Oct. 2, 2022), https://tinyurl.com/muakc2hh. Others say that smartphones are too addictive. *See* Tayana Panova & Xavier Carbonell, *Is Smartphone Addiction Really an Addiction*, 7 J. Behav. Addictions 252 (2018), https://perma.cc/G36C-Z73E. Opinions likewise differ greatly when it comes to whether and to what extent it is appropriate for minors to use online services like Instagram, TikTok, and YouTube.

20. The government may have a role in empowering parents with tools and information to make their own judgments about what speech is appropriate for their own minor children. But when the government crosses the line into deciding for itself which constitutionally protected speech minors may access, courts have invalidated such efforts as inconsistent with the First Amendment. *See, e.g.*, *Brown*, 564 U.S. at 794-95 (invalidating law prohibiting distribution of violent video games to minors without parental consent); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975) (invalidating law prohibiting display of movies containing nudity at drive-

in theaters); *Kendrick*, 244 F.3d at 573. "Minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik*, 422 U.S. at 212-13 (citation omitted). The government may, for example, "adjust the boundaries of an existing category of unprotected speech" like obscenity "to ensure that a definition designed for adults is not uncritically applied to children." *Brown*, 564 U.S. at 794. After all, something that is not obscene for adults may still be obscene for children. *See, e.g.*, *Free Speech Coal., Inc. v. Paxton (FSC)*, 606 U.S. 461, 477-78 (2025). But that does not give the government carte blanche to restrict wide swaths of "fully protected speech," *id.* at 484-85, or "create a wholly new category of content-based regulation that is permissible only for speech directed at children," *Brown*, 564 U.S. at 794.

21. Indeed, even restrictions on access to speech that is *not* constitutionally protected as to some or all minors have rarely survived scrutiny, as they often impede the First Amendment rights of adults. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656 (2004) (enjoining law restricting access to sexually explicit materials on the Internet); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000) (invalidating law restricting sexual programing on television); *Reno v. ACLU*, 521 U.S. 844 (1997) (invalidating law enacted to protect minors from "indecent" and "patently offensive" communications on the Internet). *But see FSC*, 606 U.S. 461. As courts have explained in striking down such laws, tools that enable parents to decide for themselves what speech their minor children may access are typically "less restrictive" than imposing "universal restrictions at the source." *Ashcroft*, 542 U.S. at 667.

22. In short, in a Nation that values the First Amendment, the preferred response from the government is to let parents decide what speech is appropriate for their minor children,

including by using tools that make it easier for them to restrict access should they choose to do so. And while the government may have some role to play in facilitating access to such tools, it has rarely needed to do so since market forces typically drive industries to be responsive to parents' concerns. The movie, music, and video game industries, for example, have all developed sophisticated ratings systems to assist parents.

23. The same is true of the Internet. Plaintiff's members and others have developed sophisticated tools and technologies that allow parents to supervise and restrict what their minor children see and how they see it. And those tools have evolved over time in response to market demand. Parents who wish to limit minors' access to online services, or to filter or monitor the content to which they are exposed, have many options at their disposal.

24. ***Device-level restrictions.*** Parents can decide whether and when to let their minor children use computers, tablets, and smartphones in the first place. And those who choose to let them use such devices have many ways to control what they see and do. Apple, for example, provides parents with tools to limit how long minors can spend on their iPhones, iPads, and MacBooks. *See, e.g.*, *Set Up Parental Controls to Manage Your Child's iPhone or iPad*, Apple, https://perma.cc/V73F-JZSK (last visited Nov. 4, 2026). It also provides them with tools to control what applications (e.g., Instagram, YouTube, and TikTok) minors can use, set age-related restrictions for those applications, filter online content in Safari and on other applications, and control privacy settings. *Id.* Google, Microsoft, and Samsung offer similar parental controls for their devices. *See Help Keep Your Family Safer Online*, Google Family Link, https://perma.cc/QVL9-KENQ (last visited Nov. 4, 2026); *Set up Microsoft Family Safety*, Microsoft, https://perma.cc/WY89-JT72 (last visited Nov. 4, 2026); *Manage Family Groups and Parental Controls with Your Samsung Account*, Samsung, https://perma.cc/9R7E-NJ4U (last

visited Nov. 4, 2026). And many third-party applications enable parents to control and monitor minors' use of Internet-connected devices and online services. *See, e.g.*, Charlie Osborne, *The Best Parental Control Apps of 2026*, ZDnet.com, https://perma.cc/EA7D-N4UP (last visited Nov. 4, 2026).

25. ***Network-level restrictions***. Cell carriers and broadband providers also provide parents with tools to block apps and services from their minors' devices, ensure that they are texting and chatting with only parent-approved contacts, and restrict screen time during certain hours. *See, e.g.*, *How to Use Verizon Family*, Verizon, https://perma.cc/57FJ-D6XP (last visited Nov. 4, 2026); *AT&T Secure Family*, AT&T, https://perma.cc/N8Z6-L3HJ (last visited Nov. 4, 2025); *Family Controls and Privacy*, https://perma.cc/9H3S-KKVQ, T-Mobile (last visited Nov. 4, 2026). Most wireless routers (the devices that provide wireless Internet throughout a home) contain parental control settings as well. *See* Molly Price & Ry Crist, *Parental Controls Are Easy to Set Up on Your Wi-Fi Router: Here's How to Do It*, CNET (June 26, 2025), https://perma.cc/V53F-4VKD. Parents can use those settings to block specific services and applications (Instagram, YouTube, etc.) if they do not want their minor children to access them. *See, e.g.*, *NETGEAR Smart Parental Controls*, Netgear, https://perma.cc/CY85-M22Q (last visited Nov. 4, 2026). They can limit the time spent on the Internet by turning off their home Internet at specific times during the day, pausing Internet access for a particular device or user, or limiting how long their minor children can spend on a particular website or service. *Id.* And they can set individualized content filters for their minor children and monitor the websites they visit and services they use. *Id.*

26. ***Browser-level restrictions.*** Parental controls on Internet browsers offer another layer of protection. For example, Microsoft offers "Family Safety," which allows parents to filter digital content and place screen time limits. *See, e.g.*, *Set up Microsoft Family Safety*, Microsoft,

https://perma.cc/WY89-JT72 (last visited Nov. 4, 2026). Google has a similar feature. It also provides parents with "activity reports," allowing them to see what services and websites their minor children are accessing the most. *Google's Parental Controls – Google Safety Center*, Google, https://perma.cc/RCW3-E5CN (last visited Nov. 4, 2026).

27. ***Application-level restrictions.*** NetChoice members provide parents with many tools to decide what their minor children can see and do on their services. They have devoted extensive resources to developing policies and practices to protect minors who use them, and those policies and practices have evolved over time in response to the concerns of parents and regulators.

28. For one, services operated by NetChoice members, including Instagram and TikTok, prohibit minors under 13 from accessing their main services. Some members offer separate experiences for users under 13 geared for that age group. For example, YouTube offers two services (YouTube Kids and a "Supervised Experience" on YouTube) for minors younger than 13. *See Important Info for Parents About YouTube Kids*, YouTube for Families Help, https://perma.cc/Y7VD-S597 (last visited Nov. 4, 2026); *What Is a Pre-Teen Supervised Experience on YouTube*, YouTube Help, https://perma.cc/JR6B-2G2U (last visited Nov. 5, 2026). On TikTok, users who register as under age 13 in the United States are automatically directed to a separate age-appropriate and private experience where they can view content curated specifically for younger people. Users under 13 can like videos, but they cannot comment on those videos, post or share videos with others, or send and receive messages. And their screen time on the app is limited to 60 minutes. *TikTok Under 13 Experience*, TikTok, https://perma.cc/P3JY-KG4J (last visited Oct. 31, 2026). These services allow parents to select content settings, set screen-time limits, and otherwise oversee minors' use of the services.

29. NetChoice members also expend significant resources curating the content users post on their services to ensure that it is appropriate for adults and teens alike. The vast majority of NetChoice's members—e.g., Instagram, TikTok, and YouTube—restrict the publication of (among other things) violent and sexual content, bullying, and harassment. Some prohibit content that encourages body shaming and promote content that encourages a positive self-image. Several use "age gating" to keep minors from seeing certain content visible to adults, or younger teens from seeing content visible to older teens. NetChoice members implement their content-moderation policies through algorithms, automated editing tools, and review by human employees. If a member determines that a piece of content violates its policies, it may exercise its editorial discretion to remove the content, restrict it, or add a warning label or a disclaimer to accompany it. In all cases, a member's decision is driven by editorial practices and policies, whether implemented by a trained algorithm or automated editing tool, via human review, or a combination of the two. Members can (and do) suspend or ban accounts that violate their policies.

30. NetChoice members also provide users with tools to curate the content they wish to see. Users can generally choose whom to follow. Users can also generally block or mute other users and control who may see and interact with their own content. Some members provide users with tools to exclude specific categories of content they wish to avoid. Instagram users, for example, can alter the content Meta displays by letting Meta know what topics they want to see more or less of; choosing to see more or less content that, in Meta's judgment, may be potentially upsetting or offensive; hiding comments containing keywords they find offensive or problematic; tapping "Interested" or "Not Interested" on a post to see more or less content similar to that post; blocking another account to prevent the blocked account from future interactions with them; restricting the information that a particular friend sees; or unfollowing another user altogether.

TikTok offers, among other things, a Restricted Mode, which is available to all people on the platform and parents and guardians can manage for their teens through Family Pairing, and which is intended to limit a person's exposure to content that may not be comfortable for everyone, such as content that contains mature or complex themes.

31. NetChoice members also empower parents to monitor their children's online activities on their services. Members have continued to develop and refine these tools in response to concerns from parents and regulators.

32. Meta, which operates Instagram, has worked closely with experts, parents, guardians, and teens to develop Meta's Family Center, a central place for parents to oversee their teens' accounts within Meta technologies, set up and use supervision tools, and access conversation starters, tips, and research-backed guidance designed to support families' digital experience. Family Center is a central place for parents and guardians to access resources from leading experts and supervision tools and information about how to use them. Parents and guardians can use supervision tools to set daily time limits for their teens or block use during select days and hours; set reminders to close the app; change their teen's default settings to require non-personalized feeds and stop video and animation content from automatically playing without a deliberate user action; see the average amount of time their teen has spent on Instagram over the last week (and the total time spent on Instagram for each specific day over the last week); and more. *See, e.g.*, *Support Your Teen with Supervision*, Meta, https://perma.cc/29A5-CTWD (last visited Nov. 5, 2026). Family Center also includes an education hub where parents and guardians can access resources from experts and review helpful articles, videos, and tips on topics like how to talk to teens about social media. Adam Mosseri, *Introducing Family Center and Parental Supervision Tools on Instagram and in VR*, Meta (Mar. 16, 2022), https://perma.cc/U6BX-N6L4. Meta also provides a

Safety Center with a resource library for all users, including communities such as women, LGBTQ+, parents, teens, educators, law enforcement, journalists, activists, and public figures, to discover expert-backed safety resources and tools across Meta's resources. Meta works closely with groups like ConnectSafely, the Child Mind Institute, the Digital Wellness Lab at Boston Children's Hospital, and the Trevor Project to develop resources for parents and guardians to help them have meaningful and open conversations with their teens about being online, such as the Parents Guide. *Helping Your Teen Navigate Instagram Safely*, Instagram, https://perma.cc/55C5-5LLA (last visited Nov. 5, 2026). Meta has also built resources for teens and their parents, caregivers, and educators, working to improve digital literacy. These resources help young people navigate their time online and empower them to create the safe experiences they want. *Get Digital!*, Meta, https://perma.cc/ZH5R-PUEJ (last visited Nov. 5, 2026); Meta, *Youth Safety*, https://perma.cc/K8H5-P6ZE (last visited Nov. 5, 2026). And Meta's Privacy Center provides resources for all users to make privacy choices that are right for them. *Privacy Center*, Meta, https://perma.cc/N79N-LRB3 (last visited Nov. 5, 2026).

33. Instagram has long enabled parents and guardians to set time limits for their teens, set reminders to close the app, monitor the time spent on Instagram, and monitor accounts followed by their teens and the accounts that follow them. Parents can also review the accounts blocked by their teens, as well as their teens' privacy, messaging, and sensitive-content settings. *See, e.g.*, *About Supervision on Instagram*, Instagram Help Ctr., https://perma.cc/8EV6-G6UW (last visited Nov. 5, 2026). Instagram places teens (ages 13-17)—both users who so identify based on their stated birthdate, and users Meta proactively identifies as suspected teens using artificial intelligence technology custom-built for this purpose—into Teen Accounts. Teen Accounts default to the strictest privacy settings and have limitations on who can contact teens, which content they

can see, and what time of day they receive notifications. Minors under 16 need a parent's permission to relax any of these Instagram Teen Account settings. Instagram will also provide additional supervision features, including features that allow parents to monitor with whom their teens are chatting and what they are seeing. *See, e.g.*, *Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents*, Instagram (Sept. 17, 2024), https://perma.cc/HEP4-FA9D; *We're Introducing New Built-In Restrictions for Instagram Teen Accounts, and Expanding to Facebook and Messenger*, Meta (Apr. 8, 2025), https://perma.cc/P4BB-HH5H.

34. In the coming months, Meta will be offering a suite of additional teen protections and supervision tools on Instagram. These include Time Limit, a default two-hour daily time limit that teens can only turn off with a parent's permission; Night Mode, a default block on Instagram between 12 a.m. and 6 a.m.; School Mode, which will mute notifications by default between 8 a.m. and 3 p.m.; prompts after every 15 minutes of continuous screen time on Instagram and prompts when their total daily usage hits 60 minutes and 90 minutes designed to encourage intentional use; an option to see non-personalized content by default; an option to disable autoplay; disabling cosmetic surgery and extreme makeup filters for teens; and Hidden Likes, which will restrict teens from seeing the number of likes and reactions on Instagram posts—both their own and those from others—by default. Teens will only be able to turn off these default protections with a parent's permission (and parents will be able to require those of them that are opt-in rather than default settings).

35. YouTube offers a "supervised" experience for teens (separate from the supervised experience for minors younger than 13), allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their teens' channel activity

(such as uploads, comments, and subscriptions); and (3) to choose whether to link accounts between a parent and teen. *My Family*, YouTube, https://perma.cc/2M36-LJZS (last visited Nov. 5, 2026). YouTube has also developed features and policies directed at promoting digital wellbeing among teens and children, such as turning auto-play off by default, refining its recommendation systems so teens are not repeatedly exposed to certain content, and reminding teens to take a break or go to bed. *Id.*

36. TikTok has also continued to develop and refine parental control and supervision tools. It introduced Family Pairing in 2020 and has continued to add new features, such as visibility tools that notify parents when their child posts and controls that permit parents to block selected accounts. *See Supporting Families With New Family Pairing Features*, TikTok (July 30, 2025), https://perma.cc/9N33-9X25. TikTok also offers teen accounts, which include more than 50 different features designed to allow minors to safely express their creativity, connect with friends, and learn on TikTok. *See id.*

37. NetChoice members also restrict communications between adults and teens on their services, if they allow such communications at all.

38. Instagram and TikTok, for example, take steps to limit adults from messaging teens to whom they are not connected. *See, e.g.*, *Introducing Stricter Message Settings for Teens on Instagram and Facebook*, Meta (Jan. 25, 2024) https://perma.cc/4W8B-7LBT; *Youth Safety and Well-Being*, TikTok, https://perma.cc/545W-U38R (last visited Nov. 5, 2026). And TikTok prohibits direct messages for users under the age of 16; for teens 16 and older, Family Pairing allows parents to restrict who can send direct messages to their teen or turn off direct messaging entirely.

39. Instagram encourages teens via prompts and safety notices to be cautious in conversations with adults, even those to whom they are connected. And Instagram Teen Accounts take this a step further by restricting direct messaging from people teens do not follow or are not connected to, regardless of the user's age.

40. Some NetChoice members also inform users when an adult who has been exhibiting potentially suspicious behavior attempts to interact with them. If, for example, an adult is sending a large amount of friend or message requests to people under age 18, or has recently been blocked by people under age 18, Meta limits them from finding, following or interacting with teens. *Our Work To Fight Online Predators*, Meta (Dec. 1, 2023), https://perma.cc/8HP8-MJYR. By default, the Instagram accounts of minors are set to "private" and photos and videos uploaded to those accounts are visible only to approved followers. Instagram, *Differences Between Public and Private Accounts on Instagram*, https://perma.cc/UBD3-V78E (last visited Nov. 5, 2026). For users under 16, parental consent is required to change this setting. *Id.* And in addition to the steps described above, TikTok offers a Private Account function which is turned on by default for users aged 13 to 17, and which allows an individual to approve or deny follower requests and choose people that are allowed to (1) follow them, (2) view their posts, and (3) see their bios, likes, and followers and following list.

## INDIANA HOUSE ENROLLED ACT 1408

41. Notwithstanding the long line of cases striking down government efforts to decree what constitutionally protected speech minors may access, and the wealth of tools available to help parents tailor and restrict their minor children's Internet access should they choose to do so, Indiana has taken it upon itself to decide what is appropriate for minors on the Internet. In July 2026, Indiana enacted HEA 1408 (with an effective date of January 1, 2027), which dramatically restricts

minors' access to "social media provider[s]," significantly curtailing (and in some cases, eliminating) their ability to engage in core First Amendment activities on many of the most popular online services, as well as burdening adult social media users by requiring that they repeatedly provide identification to verify their age.

42. HEA 1408 defines a "social media provider" as an "online forum, website, or application" that (1) "[f]unctions primarily to enable registered users to upload content, or access content uploaded or shared by other registered users" and that meets several other criteria: (2) "[h]as a user base in which ten percent (10%) or more of the daily active users who are less than sixteen (16) years of age spent an average of two (2) hours per day or longer on the online forum, website, or application when using the online forum, website, or application" over the previous 12 months; (3) "[e]mploys algorithms that analyze user data or information on users to select content for users"; (4) uses one or more so-called "addictive features"; and (5) is owned or operated by a person or entity that has generated $1 billion or more in one or more of the last three years. Ind. Code §24-16-2-5(a). The statute defines "addictive features" to mean (A) "[c]ontinuously loading content, or content that loads as the user scrolls down the page without the need to open a separate page"; (B) "[s]eamless content, or the use of pages with no visible or apparent end or page breaks"; (C) "[d]isplay of personal interactive metrics that indicate the number of times other users have clicked a button to indicate their reaction to content or have shared or reposted the content"; (D) "[a]utoplay video or video that begins to play without the user first clicking on the video or on a play button for the video"; and (E) "[l]ive streaming or a function that allows a user or advertiser to broadcast live video content in real time." *Id.* §24-16-2-5(a)(4).

43. HEA 1408 exempts "[a]n online service, website, or application where the exclusive function provides registered users of the service only with the ability to send and receive

electronic mail or direct messaging consisting of text, photographs, pictures, images, or videos shared only between the sender and the recipients, without displaying or posting the material publicly or to others not identified as the recipient by the sender." *Id.* §24-16-2-5(b)(1). And it excludes "device manufacturer[s]; "application store[s]"; and "communications service provider[s]." *Id.* §24-16-2-5(b)(2), (3).

44. HEA 1408 imposes several requirements on "social media provider[s]" that are relevant here.

**Age-Verification and Parental-Consent Requirements**

45. A "social media provider that receives a request from an Indiana resident for creation of an account" must "use commercially reasonable means, such as a neutral age screen mechanism, to determine the age and state of residence of the individual requesting creation of the account." *Id*. §24-16-3-1(1). If "the individual requesting creation of the account is an adolescent" (defined as under the age of 16), then the social media provider "may create the account only if [it] receives verifiable parental consent to creation of the account." *Id*. §24-16-3-1(2). HEA 1408 also establishes a procedure for terminating accounts belonging to adolescents when the account holder fails to timely provide verifiable parental consent. *See id.* §24-16-4-2. That provision requires notice to be provided to the account holder, and an opportunity for the account holder to dispute that they are an adolescent or that they failed to provide verifiable parental consent. *See id*. §24-16-4-2(c). Further, HEA 1408 requires account termination when a covered provider "determines" or has "reason to know" that a user is under 16. *Id.* §24-16-4-2.

46. HEA 1408 also imposes continuing age-verification requirements. Within two weeks after an Indiana account holder spends 25 hours on a social media provider's service over a six-month period (that is, an average of eight minutes per day), the provider must "make

reasonable efforts" and "use reasonable means … to determine the age of the Indiana account holder." *Id.* §24-16-4-1(a). That renewed age determination is used to decide whether the account remains subject to Indiana's draconian expressive-feature restrictions (more on those below). *See id.* §24-16-4-1(b). Social media providers must conduct age verification again when an Indiana account holder spends 50 hours in a six-month period, and again whenever the account holder spends an additional 100 hours on the service and each time the provider "collects demographic information of any kind regarding the … account holder." *Id.* §24-16-4-1(c), (e). These triggers are unrelated to any doubt about whether a user's previous age verification was incorrect; they are simply burdens on extended engagement with speech on covered providers' services.

47. HEA 1408 does not explain how a "social media provider" is supposed to identify who is a minor or what constitutes "verifiable parental consent." *Id.* §24-16-3-1(2). The only guidance it offers is that they must use "commercially reasonable means, such as a neutral age screen mechanism." *Id*. §24-16-3-1(1). Nor does the statute explain the meaning of "demographic information," or what it means to "collect" such information, let alone what such information has to do with a user's age.

**Expressive-Feature Restrictions**

48. For minors under 16 who are able to obtain parental consent, HEA 1408 requires "social media provider[s]" to "configure the account" of those users "such that the account holder may not activate or access" certain "features or functionality of the social media platform." Ind. Code §24-16-3-2(c). Minors under 16 cannot access these features regardless of their parents' wishes.

49. ***Restrictions on direct messaging.*** For accounts that belong to minors under 16, "social media providers" must prohibit "[f]unctionality to receive direct communications other

than direct communications from an account that the user has designated as a linked account." *Id.* §24-16-3-2(c)(1). A "linked account" means "another account with the social media provider that the user has designated" as an account "from which the user wishes to receive content," "from which the user wishes the social media provider to include in recommendations for content provided to the user by the social media provider," or "with which the user wishes to associate the user's account." *Id.* §24-16-2-4.[2]

50. ***Restrictions on appearing in search results.*** For accounts that belong to minors under 16, "social media providers" must prohibit "[f]unctionality to appear in the results of a search conducted by a person through the social media provider's search utility unless the person holds an account that the user has designated as a linked account." *Id.* §24-16-3-2(c)(2).

51. ***Restrictions on personalized content.*** For accounts that belong to minors under 16, "social media providers" may not provide "[d]issemination" of "content," "recommendations for content," or "advertising" "based on patterns of the adolescent's use of the social media provider." *Id.* §24-16-3-2(c)(3). The Act thus prohibits the distinctive "feed" that distinguishes speech on social media.

52. ***Restrictions on "addictive" features.*** For accounts that belong to minors under 16, "social media providers" may not offer "[a]ddictive features described under" Indiana Code 24-16-2-5(a)(4). Section 24-16-2-5(a)(4) in turn defines "addictive features" to mean (A) "[c]ontinuously loading content, or content that loads as the user scrolls down the page without the need to open a separate page"; (B) "[s]eamless content, or the use of pages with no visible or apparent end or page breaks"; (C) "[d]isplay of personal interactive metrics that indicate the number of times other users have clicked a button to indicate their reaction to content or have

[2] NetChoice is not challenging §24-16-3-2(c)(1) at this time.

shared or reposted the content"; (D) "[a]utoplay video or video that begins to play without the user first clicking on the video or on a play button for the video"; and (E) "[l]ive streaming or a function that allows a user or advertiser to broadcast live video content in real time." *Id.* §24-16-2-5(a)(4).

**Parental-Supervision Features**

53. HEA 1408 also requires "social media providers" to "provide the adolescent's parent or legal guardian … with the option to receive a separate password for the account that allows the parent or legal guardian" to "(1) monitor the amount of time the adolescent spends using the social media platform; (2) set daily and weekly time limits on the adolescent's use of the social media platform; (3) set limits on the times of day during which the adolescent can access the social media platform; and (4) access the adolescent's account at any time." *Id.* §24-16-3-2(d).

54. NetChoice is not challenging §24-16-3-2(d)'s requirement that "social media providers" offer these parental-supervision features.[3]

55. Indiana Code §24-16-6-1 gives the Attorney General enforcement authority, permitting the Attorney General to seek injunctive relief along with civil penalties, *see id.* §24-5-0.5-4(c).

56. HEA 1408 is scheduled to take effect on January 1, 2027.

## <u>IMPACT ON NETCHOICE MEMBERS</u>

57. If HEA 1408 takes effect, it will inflict immediate and severe First Amendment and financial injuries on NetChoice's members.

---

[3] In the event the State interprets the Act to require covered providers to grant parents the ability to directly log in to adolescents' accounts as if the parent was herself the user, NetChoice reserves the right to challenge §24-16-3-2(d).

58. At least one of NetChoice's members has standing to sue in its own right. "It is well established that preenforcement challenges are within Article III." *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012). To satisfy the injury-in-fact requirement in a preenforcement challenge, the plaintiff must show that it intends to "engage in a course of conduct arguably affected with a constitutional interest," that the intended conduct is "arguably proscribed by the statute they wish to challenge," and that there is "a credible threat of enforcement." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161-62 (2014); *see also Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988); *Satanic Temple, Inc. v. Rokita*, 163 F.4th 1061, 1071 (7th Cir. 2026).

59. When the plaintiff is the "object" of the challenged law, there is "ordinarily little question" that it has Article III standing to challenge the law. *Diamond Alt. Energy v. EPA*, 606 U.S. 100, 112 (2025). NetChoice members operate several of the services that are the "object" of HEA 1408.

60. Meta, which is a member of NetChoice, operates Instagram, which is an "object of" HEA 1408, *Diamond*, 606 U.S. at 112, as it arguably satisfies each of the criteria set forth in HEA 1408's definition of "social media provider."

61. Instagram is a "website[] or application" that "[f]unctions primarily to enable registered users to upload content, or access content uploaded or shared by other registered users." Ind. Code §24-16-2-5(a)(1). *See Share a Post*, Instagram Help Center, https://perma.cc/53RW-J8S3 (last visited Nov. 5, 2026).

62. Instagram likely has "a user base in which ten percent (10%) or more of the daily active users who are less than sixteen (16) years of age spent an average of two (2) hours per day or longer" on Instagram during the previous 12 months. Ind. Code §24-16-2-5(a)(2).

63. Instagram "[e]mploys algorithms that analyze user data or information on users to select content for users." *Id.* §24-16-2-5(a)(3).

64. Instagram utilizes some of the so-called "addictive" features identified by the law, such as "[c]ontinuously loading content"; "[s]eamless content"; "personal interactive metrics"; autoplay of video content; and live streaming. *Id.* §24-16-2-5(a)(4)(A)-(E).

65. Instagram is owned by Meta, which "generated at least one billion dollars ($1,000,000,000) in gross revenues, worldwide, in one (1) or more of the immediately preceding three (3) years." *Id.* §24-16-2-5(a)(5).

66. Instagram does not currently require verifiable parental consent for minors under age 16 to create an account. *Id.* §24-16-3-1(2). It also does not limit the appearance of minors under the age of 16 in search results to "linked account[s]" or disable the dissemination of "content"; "recommendations for content"; or advertising based on "patterns of [an] adolescent's use of the social media provider." *Id.* §24-16-3-2(c)(2), (3). Nor does it completely disable "[c]ontinuously loading content"; "[s]eamless content"; "personal interactive metrics"; autoplay of video content; and live streaming functionality for minors under age 16. *Id.* §§24-16-3-2(c)(4), 24-16-2-5(a)(4)(A)-(E).

67. Instagram does not appear to qualify for any of HEA 1408's exemptions. While direct messaging is one of Instagram's features, it is not its "exclusive" function. *Id.* §24-16-2-5(b)(1).

68. TikTok is also a member of NetChoice. It is also an "object of" HEA 1408, *Diamond*, 606 U.S. at 112, as it appears to satisfy each of the criteria set forth in HEA 1408's definition of "social media provider."

69. TikTok "enable[s] registered users to upload content, or access content uploaded or shared by other registered users." Ind. Code §24-16-2-5(a)(1).

70. It is unclear whether TikTok satisfies the criterion requiring "ten percent (10%) or more of the daily active users who are less than sixteen (16) years of age spent an average of two (2) hours per day or longer" on TikTok during the previous 12 months. Ind. Code §24-16-2-5(a)(2)(A). Among other things, it is not clear whether a company is covered by this criterion if it meets the 10% metric over certain periods but not others. In part because of this ambiguity, TikTok would face a serious risk of an enforcement action by Indiana if it did not comply with HEA 1408. Because this threshold could be calculated in a way that could result in a percentage above 10%, the costs, risks, and reputational harms associated with an enforcement action (including potentially broad investigatory demands) are sufficiently substantial that, absent an express assurance by Indiana that TikTok is not covered, TikTok will be forced to take substantial compliance measures.

71. TikTok "[e]mploys algorithms that analyze user data or information on users to select content for users." *Id.* §24-16-2-5(a)(3).

72. TikTok arguably includes at least one feature listed under §24-16-2-5(a)(4). TikTok allows users to view "metrics" related to their content, including "likes." *Liking*, TikTok Help Center, https://perma.cc/TZ33-KJZA (last visited Nov. 5, 2026).

73. Until January 22, 2026, TikTok in the United States was provided by TikTok Inc.; today it is operated by TikTok USDS Joint Venture LLC. TikTok's financial information is not publicly disclosed. Based on the scope of HEA 1408 and publicly available information

concerning TikTok's business, however, TikTok reasonably anticipates that Indiana would consider the platform subject to the Act's revenue threshold.[4] Ind. Code 24-15-2-5(a)(5).

74. TikTok does not appear to qualify for any of the exceptions under §24-16-2-5(b). While certain TikTok users have access to "direct messaging," it is not TikTok's "exclusive function." *Id.* §24-16-2-5(b)(1).

75. Although TikTok offers parental tools to help parents manage their teenagers' online experience, TikTok does not currently require verifiable parental consent for minors under age 16 to create an account. *Id.* §24-16-3-1(2). It also does not limit the appearance of minors under the age of 16 in search results to "linked account[s]"or disable the dissemination of "content" or "recommendations for content" based on "patterns of [an] adolescent's use of the social media provider." *Id.* §24-16-3-2(c)(3)(A), (B). Nor does it disable "[s]eamless content"; "personal interactive metrics"; or autoplay of video content. *Id.* §§24-16-3-2(c)(4), 24-16-2-5(a)(4)(A)-(D).

76. YouTube is also an "object of" HEA 1408, *Diamond*, 606 U.S. at 112, as it appears to satisfy each of the criteria in HEA 1408's definition of "social media provider."

77. YouTube is a "website[] or application" that "[f]unctions primarily to enable registered users to upload content, or access content uploaded or shared by other registered users." Ind. Code §24-16-2-5(a)(1). *See Upload YouTube Videos*, YouTube Help, https://perma.cc/3Y2Z-GVYG (last visited Nov. 5, 2026). YouTube Kids likewise allows users to view content created by certain YouTube users such as filmmakers, teachers, and other family-friendly creators. *See YouTube Kids*, YouTube Help, https://perma.cc/DPM5-WHQE (last visited Nov. 5, 2026),

[4] Raffaele Huang, The Wall Street Journal, *TikTok parent's revenue grows as AI spending pressures profits*, https://perma.cc/84XA-8NG5 (Sept. 16, 2026).

78. Because YouTube's current usage patterns and demographics change frequently, it is difficult for YouTube to conclusively determine whether "ten percent (10%) or more of the daily active users who are less than sixteen (16) years of age spent an average of two (2) hours per day or longer" on YouTube during the previous 12 months. Ind. Code §24-16-2-5(a)(2)(A). One significant ambiguity in HEA 1408 is that it is unclear whether a company is covered if it meets the 10% metric over certain periods but not others. YouTube does not have control over which users spend how much time using YouTube in a given time. The problem is compounded by the fact that HEA 1408 defines "daily active users" in a way that is different from how YouTube defines and measures that term.[5] Nevertheless, even though YouTube does not in the ordinary course of its business attempt to measure the specific metric made relevant by HEA 1408 (the percentage of "daily active users" who are under 16 who spend on average 2 or more hours per day using the service), YouTube would face a serious risk of an enforcement action by Indiana if it did not comply with HEA 1408. That is partly because there are multiple ways of calculating the threshold, and it is unclear which method Indiana would use. Because there is a potential way to calculate the threshold that might result in a percentage above 10%, the costs, risks, and reputational harms associated with an enforcement action (including potentially broad investigatory demands) are sufficiently substantial that, absent an express assurance by Indiana that YouTube is not covered, YouTube will face substantial compliance measures.

79. YouTube "[e]mploys algorithms that analyze user data or information on users to select content for users." Ind. Code §24-16-2-5(a)(3).

---

[5] HEA 1408 defines "Daily active users" to mean "the unique users in the United States who … used a particular online forum, website, or application at least eighty percent (80%) of the days during the previous twelve (12) months." Ind. Code. §24-16-2-3(1).

80. YouTube employs "continuously loading content"; "personal interactive metrics"; autoplay of video content; and live streaming functionality. *Id.* §24-16-2-5(a)(4)(A)-(E).

81. YouTube is owned by Google, which "generated at least one billion dollars ($1,000,000,000) in gross revenues, worldwide, in one (1) or more of the immediately preceding three (3) years." *Id.* §24-16-2-5(a)(5).

82. While YouTube restricts minors from viewing sensitive content, YouTube does not currently require Indiana minors between 13 and 16 to provide parental consent before creating an account. §24-16-3-1(2). YouTube also does not limit the appearance of minors under the age of 16 in search results to "linked account[s]" or disable the dissemination of "content"; "recommendations for content"; or advertising based on "patterns of [an] adolescent's use of the social media provider." *Id.* §24-16-3-2(c)(2), (3). Nor does YouTube disable "[c]ontinuously loading content"; "personal interactive metrics"; autoplay of video content; and live streaming functionality for minors under age 16. *Id.* §§24-16-3-2(c)(4), 24-16-2-5(a)(4)(A)-(E).

83. YouTube does not appear to qualify for any of the Act's exemptions under §24-16-2-5(b).

84. Instagram, TikTok, and YouTube (among others) have an "actual and well-founded fear that the law will be enforced against" their services. *Am. Booksellers*, 484 U.S. at 393. "The State has not suggested that the newly enacted law will not be enforced," and there is "no reason to assume otherwise." *Id.*

85. Because the services described above are "the object[s] of" HEA 1408, *Diamond*, 606 U.S. at 112, they would be forced "to take significant and costly compliance measures or risk" potential enforcement against them if HEA 1408 is not enjoined. *Am. Booksellers*, 484 U.S. at 392. To avoid the substantial risk of an enforcement action, Instagram, TikTok, and YouTube

(among others) would need to implement systems to obtain parental consent before permitting minors under 16 to create accounts. They would also need to make substantial changes to their services to comply with HEA 1408's expressive-feature restrictions. Making such changes to their services would be costly and will require a significant amount of budget, resources, and staff investment over many months and possibly longer. That "pocketbook injury is a prototypical form of injury in fact." *Collins v. Yellen*, 594 U.S. 220, 243 (2021).

86. HEA 1408 will also hinder the services' ability to communicate with their users, burdening their exercise of First Amendment rights. Instagram, TikTok, and YouTube curate and disseminate content to users that is consistent with the types of communications they wish to foster and that they think will be particularly relevant or interesting to each user. They select the content they disseminate to a user based on their content-moderation rules that reflect a host of expressive choices about what content is appropriate for their distinctive speech communities, as well as based on numerous inputs and decisions about what a user is likely to enjoy, including (but not at all limited to, *see supra* ¶16), the content that the user has interacted with in the past (via the user's account). Those "distinctive expressive offering[s]" are protected First Amendment activity. *Moody*, 603 U.S. at 738. What is more, personalization protects safety by ensuring that minors are presented with content that is safe and age-appropriate. By prohibiting Instagram, TikTok, and YouTube from deciding how to curate and disseminate content and from employing features like "continuously loading content," "personal interactive metrics," autoplay, and live streaming, HEA 1408 burdens the services' exercise of First Amendment rights. *See Moody*, 603 U.S. at 717; *Kendrick*, 244 F.3d 572.

87. In addition, HEA 1408 will burden the First Amendment rights of NetChoice members' current and prospective users to receive speech. Indeed, the rights of *all* users will be

burdened given the Act's ongoing age-verification mandates. Those rights must be taken into account when assessing the constitutionality of HEA 1408, as First Amendment scrutiny turns on whether a law is sufficiently tailored to avoid unnecessary abridgement of speech, which necessarily requires considering all the speech a law abridges.

## CLAIMS FOR RELIEF

### COUNT ONE
### First Amendment
### Age Verification and Parental Consent Requirements
### Ind. Code §§24-16-3-1, 24-16-4-1, 24-16-4-2
### (42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §§2201(a) and 2202)

88. NetChoice re-alleges and incorporates by reference the preceding paragraphs and allegations as though fully set out herein.

89. "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104. Today, those places include the "vast democratic forums of the Internet." *Id.*; *see Krasno v. Mnookin*, 148 F.4th 465, 472 (7th Cir. 2025). The Supreme Court has therefore held that the First Amendment limits the government's ability to restrict access to "social media" services, even when its ostensible aim is to protect minors.

90. In *Packingham*, for example, the Court held that a North Carolina law that barred convicted sex offenders from accessing "social media" violated the First Amendment. The state tried to justify the law on the ground that it served its interest in keeping convicted sex offenders away from minors. *See id.* at 106. While the Court acknowledged the importance of that interest, it nevertheless concluded that the law violated the First Amendment even assuming intermediate scrutiny applied. *Id.* at 106-08. By barring sex offenders from accessing "social networking" services altogether, the state had "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens." *Id.* at 106-07. Such services, the Court explained, are for many

the principal sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Id.* at 107. For the government to "foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* at 108.

91. For the same reasons, the First Amendment constrains the government's authority to restrict minors' access to those services. The Supreme Court has repeatedly held that "minors are entitled to a significant measure of First Amendment protection," *Erznoznik*, 422 U.S. at 212-13, and "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). Indeed, "[a] juvenile's ability to worship, associate, and speak freely is [] not simply a privilege that benefits her as an individual, but a necessary means of allowing her to become a fully enfranchised member of democratic society" upon attaining majority. *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1055 (7th Cir. 2004). Just as "the First Amendment strictly limits [the government's] power" to "selectively … shield the public from some kinds of speech," it strictly limits the government's power to suppress speech in order "to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 209, 213-14. That principle applies with particular force to content and speaker-based statutes like the Act. While "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794-95. In short, "[c]hildren have First Amendment rights," and the grounds for restricting them must be "compelling." *Kendrick*, 244 F.3d at 576.

92. Applying those principles, courts have routinely applied First Amendment scrutiny to efforts to protect minors from purportedly harmful speech on new forms of media—including

efforts to require minors to obtain parental consent before accessing fully protected speech—and struck them down. In *Brown*, the Supreme Court held that a California law that prohibited the sale of violent video games to minors without parental consent was subject to, and failed, First Amendment scrutiny. 564 U.S. at 804-05. While California (and the dissent) resisted the notion that "persons under 18 have any constitutional right to speak or be spoken to without their parents' consent," the Court disagreed. *Id.* at 795 n.3. Of course, "parents have traditionally had the power to control what their children hear and say." *Id.* And the state perhaps "has the power to *enforce* parental prohibitions—to require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend." *Id.* "But it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*" while escaping First Amendment scrutiny. *Id.* Otherwise, states could make it "criminal to admit persons under 18 to a political rally without their parents' prior written consent—even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors." *Id.* Such laws "are obviously an infringement" on the First Amendment rights of "young people and those who wish to" engage with them. *Id.* They "do not enforce parental authority over children's speech," they "impose governmental authority, subject only to a parental veto." *Id.*; *see also Kendrick*, 244 F.3d 572 (striking down ordinance limiting minors' access to video games that depict violence).

93. Given those long-settled principles, it is unsurprising that several courts around the country have concluded that state laws restricting minors' access to fully protected speech on "social media" services—including laws requiring parental consent to create accounts on them—are subject to First Amendment scrutiny and fail to pass muster. *See, e.g.*, *Hilgers*, 840 F.Supp.3d.

at 790; *Jones*, 822 F.Supp.3d at 675-76; *Reyes*, 748 F.Supp.3d at 1120-23, 1134; *Griffin*, 2025 WL 978607, at *17. *But see Uthmeier*, 2026 WL 3071065, at *12; *Yost*, 180 F.4th at 288-93.

94. HEA 1408 should meet the same fate. The age-verification and parental-consent requirements prohibit minors under 16 from creating accounts with "social media providers" absent parental consent. The Act defines "social media providers" to include services that enable users to "upload content" or "access content uploaded or shared by other users"—in other words, services where users engage in a broad range of fully protected First Amendment activity. Worse still, the Act singles out services that minors especially enjoy using; whether a service is covered by the law turns in part on how long minors spend on it and whether it employs tools purportedly designed to bring to their attention content they might like. HEA 1408 thus requires minors to obtain parental consent before creating accounts on some of the world's most popular services for engaging in First Amendment activity, including Instagram, TikTok, and YouTube.

95. By restricting minors from creating accounts on covered services featuring fully protected speech, Indiana has "prevent[ed] … user[s] from engaging in the legitimate exercise of First Amendment rights," *Packingham*, 582 U.S. at 108.

96. On top of that, by effectively requiring all users to verify their age before creating an account (and as the user hits certain thresholds of time spent engaging with the service), Ind. Code §24-16-3-1(1), HEA 1408 burdens the First Amendment rights of *adults* to access those covered services too. As the Supreme Court recently reaffirmed, requiring adults to prove their age before accessing speech (even speech that is unprotected as to minors) "is a burden on the exercise of" their First Amendment rights. *FSC*, 606 U.S. at 483. By forcing adults to either surrender sensitive personal information (in this case, repeatedly for up to ten years) to access protected speech or drastically curtail their consumption of protected speech, HEA 1408

"discourage[s] users from accessing" online services and may even "completely bar" some adults from doing so. *Reno*, 521 U.S. at 856.

97. The unique aspects of online services like Instagram, TikTok, and YouTube only heighten the First Amendment values at stake. While government restrictions on books, magazines, movies, and video games prohibit people from *receiving* speech, HEA 1408 also restricts users' ability to engage in their own speech and associate with like-minded users. HEA 1408's age-verification and parental-consent requirements also interfere with the First Amendment rights of NetChoice members to disseminate both their own and third-party speech to their users on covered services. *See Moody*, 603 U.S. at 731-32, 741; *Reyes*, 748 F.Supp.3d at 1120-23. And (as explained below) even if a covered service has obtained verifiable parental consent, HEA 1408 restricts speech that the service would otherwise present to the user. Such heavy-handed state restrictions plainly implicate the First Amendment.

98. HEA 1408 is subject to (at a minimum) intermediate scrutiny. *See Packingham*, 582 U.S. at 103. But because HEA 1408 draws speaker- and content-based distinctions on its face, it is subject to strict scrutiny. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *Alvarez*, 679 F.3d at 604.

99. On its face, HEA 1408 favors provider-generated speech over user-generated speech. It defines "social media provider" to include services that "[f]unction[] primarily to enable *registered users* to upload content, or access content uploaded or shared by *other registered users*." Ind. Code. §24-16-2-5(a) (emphasis added). HEA 1408 sweeps in services like Instagram and TikTok because they primarily facilitate user-to-user speech. But it exempts services like Hulu and Disney+ because they primarily facilitate provider-generated speech.

100. Distinguishing between user-generated speech and provider-generated speech is a content and speaker-based distinction. The Supreme Court has repeatedly warned that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Laws that "discriminate among media," moreover, "often present serious First Amendment concerns," particularly where the discrimination risks "distort[ing] the market for ideas." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659-60 (1994); *see Alvarez*, 679 F.3d at 604 (suggesting exemption from police-recording ban for media would be speaker distinction triggering strict scrutiny). Those concerns are on full display here. While the law purports to address risks from minors' use of social media, it does not restrict access to all mediums that employ similar features to engage their audience. The law leaves services like Disney+ and Hulu uncovered, even though many minors spend hours on those services each day, and even though they employ the same so-called "addictive features" like "autoplay" and "continuously loading content," Ind. Code. §24-16-2-5(a)(4). *See* Disney, *Parental Controls on Disney+*, Disney, (last visited Oct. 14, 2026), https://perma.cc/32NM-6FWE (autoplay). Such "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes," rather than disfavoring content. *NIFLA v. Becerra*, 585 U.S. 755, 774 (2018). The state's only possible justification for restricting access to services like Instagram, TikTok, and YouTube while leaving many other mediums for speech untouched is its apparent belief that the covered services deliver *content* that the state thinks is particularly harmful.

101. To be sure, services focused on user-generated speech may contain some of the same content as services focused on provider-generated speech. But certain content and viewpoints are far more likely to proliferate on the former than the latter. For example, ESPN and Instagram both include content about sports. But while ESPN publishes news about sports,

Instagram will also include all sorts of other content and viewpoints about the topic—everything from memes to parodies to unfiltered discussion among fans praising their favorite teams, trash-talking opposing teams, and reacting to the latest highlight. Hulu and TikTok might both include content related to politics. But only the latter will include the diverse viewpoints and perspectives that proliferate when users debate with other users on the hottest topics of the day. In fact, "social media" is popular in part because it provides a forum for less filtered discussions and a broader array of speakers, subjects, and viewpoints than are typically reflected in the traditional sources of information that Indiana apparently favors. As courts have explained, preferencing "provider-generated content over user-generated content is a content-based regulation." *See SEAT v. Paxton*, 765 F.Supp.3d 575, 592 (W.D. Tex. 2025), *rev'd on other grounds*, 184 F.4th 420 (5th Cir. 2026); *Reyes*, 748 F.Supp.3d at 1122-23; *Jones*, 822 F.Supp.3d at 673. *But see Uthmeier*, 2026 WL 3071065, at *12.[6]

102. HEA 1408 cannot satisfy any level of heightened scrutiny, let alone strict scrutiny. Strict scrutiny requires Indiana to demonstrate that HEA 1408 is "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). As for intermediate scrutiny, the government cannot "slide through the test merely because another alternative would not be quite as good." *Hodgkins*, 355 F.3d at 1060. Instead, intermediate

[6] While the Eleventh Circuit held in *Uthmeier* that distinctions between user-generated speech and provider-generated speech are content neutral, that is incorrect. As the Supreme Court has repeatedly explained, speaker-based distinctions are often proxies for content discrimination. That is the case here. To the extent the state tries to justify the distinction between services that primarily facilitate user-generated speech and services that primarily facilitate provider-generated speech on the theory that the former is more "addictive" than the latter, there is no way to understand that justification as being about anything other than the underlying *content*, particularly given many services that primarily facilitate provider-generated content use the same features (e.g., personalization) that the Act prohibits for user-generated speech. The only conceivable reason for thinking that user-generated speech is more "addictive" than the latter is because the former is likely to include content and viewpoints that minors find more engaging.

scrutiny requires it to show that HEA 1408 is "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06. The state's interest must be "unrelated to the suppression of free speech." *FSC*, 606 U.S. at 495-96. And its chosen solution may not "burden substantially more speech than necessary to further those interests." *Id*. at 496. HEA 1408 flunks both levels of scrutiny.

103. HEA 1408 "straddles the fence" between "helping concerned parents control their children" and addressing what the state thinks is a "serious social problem." *Brown*, 564 U.S. at 805. As a means of assisting concerned parents, HEA 1408 "burden[s] substantially more speech than necessary," *FSC*, 606 U.S. at 471, because "it abridges the First Amendment rights of young people whose parents" think social media is harmless, or even an affirmatively good thing for their children. *Brown*, 564 U.S. at 805, *cf. Hodgkins*, 355 F.3d at 1055. "Not all of the children who are forbidden" to create and maintain an account on social media without parental consent "have parents who *care* whether" they do so. 564 U.S. at 804. "While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought* to want." *Id.* That is "not the narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires." *Id.*

104. Nor can Indiana justify HEA 1408 as a means of protecting minors from alleged "addiction" to social media. While protecting minors is certainly a laudable goal, here that interest is plainly related to the suppression of expression. For one, the Act's ongoing age-verification requirements have nothing to do with suspicions that a user circumvented the initial age-verification; instead, they simply impose burdensome, duplicative verification as a consequence for spending what Indiana believes is too much time on a covered service. And HEA 1408 does not regulate "addiction" to *nonspeech* products like drugs or gambling. It seeks to protect minors

from alleged "addiction" to services where they access, engage in, and interact with *speech*. But Indiana has no legitimate interest in restricting access to speech on covered services just because minors find it especially appealing. It could not validly restrict access to Disney+ because it offers too many shows that "contain … catchy jingles," *Sorrell v. IMS Health*, 564 U.S. 552, 578 (2011), any more than it could restrict access to books that end in cliffhangers. As the Supreme Court has repeatedly made clear, "the fear that speech might persuade provides no lawful basis for quieting it." *Id.* at 576. Burdening access to protected speech that citizens find especially interesting is especially inconsistent with the First Amendment.

105. In all events, HEA 1408 "burden[s] substantially more speech than necessary" to achieve its interests in protecting minors from "addiction" to covered social media services. *FSC*, 606 U.S. at 471. Unlike laws that restrict access to websites that contain content that is *unprotected* as to minors, HEA 1408 restricts "with one broad stroke" access to services that for many are valuable sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. And it has the practical effect of burdening adults' access to those services, even though Indiana has no legitimate reason to do so. (Indeed, the Act's continuing age-verification requirements are not linked to any concerns about minors circumventing the initial age verification; they appear to be a naked tax on all users' consumption of protected speech.) Indiana could not restrict all minors under 16 from obtaining library cards just because some might come across *Fifty Shades of Grey*, or because others might spend two or more hours a day reading *The Hunger Games*. For the same reasons, Indiana may not restrict minors from creating accounts on "social media" services just because some may spend more time on them than Indiana thinks they should.

106. Moreover, Indiana has "too readily forgone options that could serve its interests just as well, without substantially burdening" protected speech. *McCullen*, 573 U.S. at 490; *see Packingham*, 582 U.S. at 107. To survive intermediate scrutiny, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen*, 573 U.S. at 495. Parents already have many tools to protect their minors on the Internet, including refusing to give them Internet-connected devices at all. Indiana itself takes that approach when it comes to limiting minors' access to "social media" in schools, including by restricting the use of cell phones during the school day. *See* Ind. S. Enrolled Act 78. Here, too, parents already have ample tools at their disposal to restrict minors' access to "social media providers." *See, e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); *Griffin*, 2025 WL 978607, at *14; *Reyes*, 748 F.Supp.3d 1126-30. *But see Uthmeier*, 2026 WL 3071065, at *14.[7] "Filling the remaining modest gap in concerned parents' control can hardly be a compelling state interest." *Brown*, 564 U.S. at 803.

107. Indeed, HEA 1408's parental supervision provisions require covered services to provide parents with tools to "monitor the amount of time the adolescent spends using the social media platform," to "set daily and weekly time limits on the adolescent's use of the social media platform," and to "set limits on the times of day during which the adolescent can access the social

[7] The Eleventh Circuit concluded that a similar Florida law survived intermediate scrutiny. That decision is incorrect. The Eleventh Circuit ignored that, even under intermediate scrutiny, the government may not "burden substantially more speech than necessary." *FSC*, 606 U.S. at 47. And it discounted the fact that, even under intermediate scrutiny, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen*, 573 U.S. at 495. The Eleventh Circuit suggested that that principle does not apply to "internet-related" cases. *Uthmeier*, 2026 WL 3071065, at *14. But the Supreme Court has squarely applied that principle in an internet-related case. *See Packingham*, 582 U.S. at 107 (explaining that more "[s]pecific laws" that burden less speech "must be the State's first resort to ward off" harm to minors).

media platform[s].” Ind. Code §24-16-3-2(d). Even under intermediate scrutiny, “a prophylaxis-upon-prophylaxis approach” is “a significant indicator that the regulation may not be necessary for the interest it seeks to protect.” *FEC v. Cruz*, 596 U.S. 289, 306 (2022). That Indiana insists on layering additional restrictions on top of those existing ones underscores that its real concern is that some parents choose not to prevent their minor children from creating accounts on “social media” services or limit the amount of time they spend on them. But the First Amendment does not tolerate speech restrictions “in support of what the State thinks parents *ought* to want.” *Brown*, 564 U.S. at 804.

108. In sum, HEA 1408’s age-verification and parental-consent requirements trigger, and cannot satisfy, any form of heightened scrutiny. They are unconstitutional on their face. At a minimum, they are unconstitutional as applied to NetChoice members who qualify as “social media providers” covered by the Act.

**COUNT TWO**
**First Amendment**
**Restrictions on Personalized Content and Advertising and “Addictive” Features**
**Ind. Code §§24-16-3-2(a), (b), (c)(3) and (c)(4)**
**(42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §§2201(a) and 2202)**

109. NetChoice re-alleges and incorporates by reference the preceding paragraphs and allegations as though fully set out herein.

110. Section 24-16-3-2(c)(3) prohibits “social media providers” from disseminating to minors under 16 any “content,” “recommendations for content,” and “advertising” “based on patterns of the adolescent’s use of the social media provider.”

111. Section 24-16-3-2(c)(4) bans “social media providers” from offering to minors under 16 the so-called “addictive” features set forth in §24-16-2-5(a)(4): “[c]ontinuously loading content,” “[s]eamless content,” “[d]isplay of personal interactive metrics,” “[a]utoplay video,” and “[l]ive streaming.”

112. Sections 24-16-3-2(c)(3) and (4) interfere with the First Amendment rights of "social media providers" covered by the law as well as their users.

113. The First Amendment protects the expressive choices inherent in NetChoice members' constitutional right to "present[] a curated compilation of speech originally created by others." *Moody*, 603 U.S. at 728. That First Amendment right includes not just decisions on "whether" but also "how" to "convey posts having a certain content or viewpoint." *Id.* at 738. NetChoice members "engag[e] in [protected] expression" by "compiling," "curating," and "display[ing]" expressive content according to each members' judgments about what speech to elevate, *id.* at 731, 740, and the First Amendment protects their discretionary editorial judgments about "how to construct and operate their platforms" to achieve those expressive aims, *see Reyes*, 748 F.Supp.3d at 1120-23, 1134.

114. Those constitutional protections do not vanish when content and advertisements are tailored to users based on information about the user in the social media provider's possession. In *Moody*, for instance, the Supreme Court acknowledged that YouTube provides "an individualized list of video recommendations" to users "achieved through the use of algorithms." 603 U.S. at 734. "The selection and ranking," the Court recognized, "is most often based on a user's expressed interests and past activities." *Id.* at 734-35. Yet the Court nevertheless explained that when services "decide which third-party content those feeds will display, or how the display will be ordered and organized, they are making expressive choices" protected by the First Amendment. *Id.* at 740; *see also, e.g.*, *Jones*, 822 F.Supp.3d at 667; *Reyes*, 748 F.Supp.3d at 1120-23, 1134.

115. Similarly, services do not lose constitutional protection when they tailor advertisements to specific audiences using information they have collected about those audiences. *Sorrell*, for example, involved a challenge to a Vermont law that restricted the sale, disclosure, and

use of pharmacy records that reveal the prescribing practices of individual doctors. Pharmaceutical manufacturers wanted to use that information to better tailor their marketing tactics to specific doctors. 564 U.S. at 558-59. In holding the statute facially unconstitutional, the Court explained that "[a]n individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Id.* at 568. Vermont attempted to defend the statute by insisting that allowing pharmaceutical manufacturers to tailor their marketing strategies to individual doctors using information about their prescribing practices would have "a strong influence on doctors' prescribing practices." *Id.* at 577. The Court rejected that logic as "incompatible with the First Amendment." *Id.* "That the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Id.* at 578.

116. Given those principles, it is unsurprising that courts across the country have repeatedly enjoined states from enforcing laws like Indiana's that ban targeted advertising. *See, e.g.*, *NetChoice v. Murrill*, 812 F.Supp.3d 594, 652-55 (M.D. La. 2025); *SEAT*, 765 F.Supp.3d at 598-99. "By regulating what material these companies can publish (i.e., advertising based on prohibited data …), the advertising prohibition functions as a content-based restriction" subject to strict scrutiny. *Murrill*, 812 F.Supp.3d at 654.

117. Sections 24-16-3-2(c)(3) should meet the same fate. By banning social media providers from offering personalized content and advertisements, Indiana has impermissibly burdened both the First Amendment rights of social media providers to disseminate personalized content and advertisements to their users, as well as the First Amendment rights of users to receive personalized content and advertisements.

118. Section 24-16-3-2(c)(4)'s prohibition on the use of so-called "addictive" features likewise burdens First Amendment activity. Indiana cannot strip speakers of their editorial discretion over what expressive devices to use to keep audiences engaged. Expressive works have always used editorial features to capture and sustain the audience's attention. TV episodes end on cliffhangers to encourage viewers to tune in next week. Books employ shorter chapters to keep readers from putting them down. Movies tease future plot points with post-credit scenes to entice the audience to stay seated past the credits and return for the sequel. It is unthinkable that Indiana could ban producers from using cliffhangers, force authors to write longer chapters, or forbid studios from using post-credit scenes—let alone do so precisely because those techniques make protected expression engaging. Similarly, the government cannot force NetChoice members to surrender control over how they present content on their platforms in an effort to make it less enticing. *Cf. Mia. Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper … constitute the exercise of editorial control and judgment.").

119. Speech protections do not diminish just because new mediums (like "social media providers") employ new tools (like the so-called "addictive" features) to generate and sustain audience interest. That mode of First Amendment analysis has long since been discredited. *See Moody*, 603 U.S. at 733.

120. Section 24-16-3-2(c)(4)'s restriction on "addictive" features thus interferes with NetChoice members' constitutional right to "presen[t] a curated compilation of speech originally created by others," *Moody*, 603 U.S. at 728, as well as the constitutional rights of users to receive speech.

121. Sections 24-16-3-2(c)(3) and (4) trigger strict scrutiny because they are content-based. As explained above, HEA 1408 is content-based through and through because it distinguishes between services that primarily facilitate user-generated speech and services that primarily facilitate provider-generated speech. That speaker-based distinction reflects the state's content-based preferences. *See supra* ¶¶100-01.

122. Section 24-16-3-2(c)(3) is content based for another reason: It targets *personalized* content. To be sure, the specific subject matter that qualifies as personalized content varies by user, but a law aimed at a quality of speech does not escape content-based status simply because that quality encompasses multiple discrete topics. *See, e.g.*, *Brown*, 564 U.S. at 793. For example, if a law prohibited newspapers from publishing "interesting" or "persuasive" articles, it would plainly be content based even though the articles that qualify as "interesting" or "persuasive" may span a range of topics and vary depending on the newspaper's readership. (The same is true of "violent" speech, *cf. Brown*, 564 U.S. at 796-97—a broad category that can apply to anything from Clausewitz to slasher movies.) Or consider a publishing house like Condé Nast, which publishes *Vogue* (which focuses on women's luxury fashion), *GQ* (for men's style), and *Teen Vogue* (aimed at teens). These magazines cater their content for those audiences and tailor their advertising accordingly; the difference between *GQ* and *Teen Vogue* plainly relates to their content. So too here: The restriction on personalized content and advertisements is content based even though the category of personalized content and advertisements may encompass many different topics. Indeed, as applied to NetChoice members' interaction with individual users, the law does cover discrete topics—for example, barring YouTube from using a minor's expressed interest in sports to show her sports highlights, and restricting Instagram from using a minor's expressed interest in cooking to show him cooking videos.

123. Sections 24-16-3-2(c)(3) and (4) flunk any level of heightened scrutiny. To the extent the state's concern is that personalized content and "addictive" features render "social media" too addicting, those interests are plainly related "to the suppression of free speech," *FSC*, 606 U.S. at 471. *See supra* ¶¶39-40.

124. Regardless, the challenged provisions are not an adequately tailored means of addressing the relevant state interest. Here, too, sections 24-16-3-2(c)(3) and (4) "burden substantially more speech than necessary to further [their] interests." *FSC*, 606 U.S. at 495-96. Unlike laws that restrict access to services that contain content that is unprotected as to minors, *see id*. at 467-68, the provisions here restrict "with one broad stroke" expressive features for online services that for many are valuable sources for keeping abreast of current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge," *Packingham*, 582 U.S. at 107. Indiana may not restrict all minors under 16 from receiving personalized content or utilizing so-called "addictive" features just because some minors may spend more time on "social media" than Indiana thinks they should.

125. On top of that, Indiana has "too readily forgone options that could serve its interests just as well, without substantially burdening" protected speech. *McCullen*, 573 U.S. at 490; *see Packingham*, 582 U.S. at 107. As noted *supra* ¶¶27-40, parents already have many tools to protect their minors on social media, including tools that Indiana already uses itself. Indeed, Indiana has not explained why HEA 1408's separate requirement that "social media providers" offer tools for parents to control when and how much time minors spend on their services are insufficient to achieve its goals (especially in light of the many tools those services already provide). Nor has Indiana explained why it needs to completely *ban* personalized content and "addictive" features for minors under 16, regardless of whether their parents consent. (To be clear, that would be

unconstitutional as well—but it is quite telling that Indiana has skipped right past such a measure in enacting a total prohibition.)

126. Section 24-16-3-2(c)(3) and (4), trigger, and fail, any level of heightened scrutiny. These provisions are unconstitutional on their face. At a minimum, they are unconstitutional as applied to NetChoice members who qualify as "social media providers" under the Act.

**COUNT THREE**
**First Amendment**
**Restriction on Appearance in Search Results**
**Ind. Code §§24-16-3-2(a), (b), and (c)(2)**
**(42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §§2201(a) and 2202)**

127. NetChoice re-alleges and incorporates by reference the preceding paragraphs and allegations as though fully set out herein.

128. Indiana Code §24-16-3-2(c)(2) prohibits social media providers from displaying the profiles of under-16 users in the results of searches generated by non-pre-approved "linked" accounts. This provision prohibits speech even when an adolescent's parent consents and, indeed, even if the parent affirmatively *wants* their child to be findable to, say, a college athletics recruiter.

129. This restriction burdens the speech of users under 16 who may want to reach a wide audience, including adults. "An individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Sorrell*, 564 U.S. at 568 (quoting *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 32, (1984)). That is just the case here. For example, a precocious classical piano virtuoso might seek a broad audience for his talents. A promising high school basketball player might want to display her highlights to elevate her profile among college scouts. Those minors may want users in that audience to be able to find them (for example, to offer musical or athletic opportunities).

130. By prohibiting minors from appearing in search results, §24-16-3-2(c)(2) restricts a massive amount of protected speech. Social media, after all, "allows users to gain access to

information and communicate with one another about it on any subject that might come to mind." *Packingham*, 582 U.S. at 107. HEA 1408's search-result restriction isolates minors from that modern public square, denying them countless opportunities to "speak and listen, and then, after reflection, speak and listen once more." *Id.* at 104.

131. The search-result restriction is content based for the same reason that the other provisions are content based. As explained, HEA 1408 is content based because it distinguishes between services that primarily facilitate user-generated speech and services that primarily facilitate provider-generated speech. That speaker-based distinction reflects the state's content-based preferences. *See supra* ¶¶100-01, 121.

132. It is not clear what the purpose of this restriction is. HEA 1408 contains no legislative findings or statement of purpose. But to the extent the state's interest is in protecting minors from adult predators, sections 24-16-3-2(c)(2) is not even close to narrowly tailored to that interest. For one, it applies to other minors that users may wish to find. And for another, it burdens valuable speech in many ways that have nothing to do with the state's purported justifications.

133. Once again, moreover, Indiana has left obvious, less-restrictive alternatives on the table. To the extent the state is concerned about illicit communications between adults and minors, "the state could more precisely target illicit communication[s]." *Doe v. Prosecutor, Marion Cnty.*, 705 F.3d at 700. In fact, the Seventh Circuit has already held that "Indiana has other methods to combat unwanted and inappropriate communication between minors" and adults. *Id.* at 699. "For instance, it is a felony in Indiana for persons over twenty-one to 'solicit' children under sixteen 'to engage in'" sexual conduct. *Id.* (citing Ind. Code §35-42-4-6). "A separate statute goes further" and "punishes mere 'inappropriate communication with a child.'" *Id.* (citing Ind. Code §35-42-4-13). "Significantly, both statutes have enhanced penalties for using a computer network and better

advance Indiana's interest in preventing harmful interaction with children (by going beyond social networks). They also accomplish that end more narrowly (by refusing to burden benign Internet activity)." *Id.* If the state thinks that these statutes have been ineffectual (a finding it did not make in enacting HEA 1408, undercutting both the sincerity and the strength of such a justification, *see Joelner v. Vill. of Wash. Park*, 508 F.3d 427, 432 (7th Cir. 2007)) it could dedicate more resources to enforcement or "increas[e] the sentences for solicitation." *Doe*, 705 F.3d at 701. "Specific laws of that type must be the State's first resort to ward off the serious harm that sexual crimes inflict." *Packingham*, 582 U.S. 107.

134. HEA 1408 also leaves less-restrictive alternatives on the table by reference to its own provisions. Most obviously, the search-result restriction could simply be incorporated in HEA 1408's parental-control provisions, allowing parents to decide whether other users can see a minor's account in search results. NetChoice's members also offer a number of privacy settings to reduce the visibility of minors' accounts. For example, on Instagram, users can set their accounts to private and delink their Instagram accounts from other social media. *Differences Between Public and Private Accounts on Instagram*, https://perma.cc/UBD3-V78E (last visited Nov. 9, 2026). Likewise, TikTok defaults users under 16 into private accounts that restrict posted content to approved followers. TikTok Help Center, *Choosing Between a Private or Public Account*, https://perma.cc/EM5E-HBA4 (last visited Nov. 9, 2026). Indiana has offered no explanation for why those protections do not suffice.

135. Section 24-16-3-2(c)(2), triggers, and fails, any form of heightened scrutiny. It is unconstitutional on their face. At a minimum, it is unconstitutional as applied to NetChoice members who qualify as "social media providers" under the Act.

**COUNT FOUR**
**EQUITABLE RELIEF**

136. NetChoice re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

137. Indiana Code §§24-16-3-1; 24-16-4-1; 24-16-3-2(c)(3), (4); and 24-16-3-2(a)-(b) and (c)(2) are unconstitutional both on their face and as applied to NetChoice's members who own or operate services that qualify as "social media providers" under the Act, and they deprive NetChoice's members and their users of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *See Ex parte Young*, 209 U.S. 123 (1908); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

138. This Court can and should exercise its equitable power to enter a preliminary injunction enjoining Attorney General Rokita, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing the challenged provisions of HEA 1408 against NetChoice members who own or operate "social media providers" as defined by the Act.

139. This Court can and should exercise its equitable power to enter a permanent injunction enjoining Attorney General Rokita, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing the challenged provisions of HEA 1408 against NetChoice members who own or operate "social media providers" as defined by the Act.

**COUNT FIVE**
**DECLARATORY RELIEF**

140. NetChoice re-alleges and incorporates by reference the preceding paragraphs and allegations as though fully set out herein.

141. Indiana Code §§24-16-3-1; 24-16-4-1; 24-16-4-2; and 24-16-3-2(a)-(b) and (c)(2) are unconstitutional both on their face and as applied to NetChoice's members who qualify as

"social media providers" under the Act, and they deprive NetChoice's members and their users of enforceable federal rights.

142. With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. §2201(a). And they have the power to grant "[f]urther necessary or proper relief based on a declaratory judgment or decree … after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." *Id.* §2202.

143. This Court can and should exercise its power under §§2201(a) and 2202 to enter a declaration that Indiana Code §§24-16-3-1; 24-16-4-1; 24-16-4-2; and 24-16-3-2(a)-(b) and (c)(2) on their face violate the United States Constitution and are therefore void and unenforceable, or, in the alternative, that they are unconstitutional as applied to NetChoice members who qualify as "social media providers" under the Act.

## PRAYER FOR RELIEF

NetChoice prays for the following relief from the Court:

A declaration, pursuant to 28 U.S.C. §§2201(a) and 2202, that Indiana Code §§24-16-3-1; 24-16-4-1; 24-16-4-2; and 24-16-3-2(a)-(b) and (c)(2) on their face violate the United States Constitution and are therefore void and unenforceable, or, in the alternative, that they are unconstitutional as applied to NetChoice members who qualify as "social media providers" under the Act.

A preliminary injunction enjoining Attorney General Rokita, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing Indiana Code §§24-

16-3-1; 24-16-4-1; 24-16-4-2; and 24-16-3-2(a)-(b) and (c)(2) against NetChoice members who qualify as "social media providers" under the Act.

A permanent injunction enjoining Attorney General Rokita, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing Indiana Code §§24-16-3-1; 24-16-4-1; 24-16-4-2; and 24-16-3-2(a)-(b) and (c)(2) against NetChoice members who qualify as "social media providers" under the Act.

Such costs and reasonable attorneys' fees to which NetChoice may be entitled by law, including under 42 U.S.C. §1988.

Any further relief that the Court deems just and proper.

Respectfully submitted,

Erin E. Murphy*
James Y. Xi*
Jeffrey C. Thalhofer*
*Pro hac vice forthcoming*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

/s/ *Todd A. Richardson*
TODD A. RICHARDSON (16620-49)
JAMES E. ZOCCOLA(15885-29)
LEWIS KAPPES
One American Square Suite 2500
Indianapolis, IN 46282
(317) 639-1210

*pro hac vice forthcoming

*Counsel for Plaintiff NetChoice*

November 18, 2026